(117 N. W. 864.)

---

IN THE MATTER OF THE APPLICATION OF WILLIAM CONNOLLY AND VINCENT KOVASH FOR A WRIT OF HABEAS CORPUS.

Opinion filed October 15, 1908.

**Constitutional Law — Special Legislation — County Seat Removal.**

1. Chapter 77, page 159, Laws 1905, which provides in effect that in all organized counties not having more than 6,500 inhabitants and in which no courthouse had been constructed prior to the taking effect of the act, proceedings for county seat removals may be initiated by a petition signed by the inhabitants thereof equal in number to one-third of the votes cast therein for governor at the last election, and further providing for a removal of such county seat by a mere majority vote, is unconstitutional and void, as special legislation.

**Same.**

2. The act includes within its terms counties to be subsequently organized; but such attempted classification of the counties having no courthouse upon a certain date, and which perpetually precludes them from passing out of such class into the general class after they have erected such buildings, is purely arbitrary, having no reasonable basis to support it.

Application of William Connolly and Vincent Kovash for writ of habeas corpus.

Application granted.

*Crawford & Burnett* and *Ball, Watson, Young & Hardy,* for petitioners.

*R. N. Stevens* and *J. M. Hanly,* for defendants.

FISK, J. This is a joint application by William Connolly and Vincent Kovash for the issuance by this court of a writ of habeas corpus. The petitioners, who are county commissioners of Dunn

county, were adjudged guilty of contempt of court and committed to jail for refusing, as such commissioners, to comply with a certain peremptory writ of mandamus issued by the judge of the district court commanding them to call a special election for the purpose of submitting to the voters of said county the question of relocating the county seat therein, pursuant to a petition of the inhabitants thereof, under the provisions of chapter 77, page 159, Laws 1905. Counsel have stipulated that the merits may be heard and determined on the application and stipulation of facts, without the formal issuance of a writ. They have also stipulated that the following are the sole questions involved: (1) The constitutionality of chapter 77 aforesaid; (2) whether said act applies to Dunn county; (3) whether said act was repealed or amended by chapter 61, page 86, Laws of 1907; and (4) whether, in case chapter 77 is valid, a majority or two-thirds vote is necessary to remove the county seat. It is agreed by counsel that, if chapter 77 aforesaid is valid and applies to Dunn county, the refusal to order the election was wrong, and petitioners were duly committed for contempt, and hence are not entitled to the writ prayed for. On the other hand, if said act is void or is not applicable to Dunn county, the petitioners are entitled to their liberty.

As we view the matter, the first two are the only questions requiring consideration. Following is the full text of said law:

"Section 1. In all organized counties in this state wherein prior to the taking effect of this act no courthouse has been constructed or is owned by such county, the county commissioners shall, upon the petition of the inhabitants of such county, equal in number to one-third of the votes cast therein for Governor at the last preceding election, submit to the electors of such county at a special election to be called in sixty days, or at the next general election. as may be required by said petition, the question of moving the county seat from the place where it is located by law or otherwise, to another place. Such petition must be verified by the affidavit of each of the signers thereof, stating that he is a resident of the county, and a qualified elector therein and that he personally signed such petition.

"Sec. 2. Notice of such election shall be given in the manner prescribed by section 1882 of the Revised Codes of North Dakota for the year A. D. 1899.

"Sec. 3. In voting on the question each elector must vote for the place in the county which he prefers by placing opposite the name of the place the mark 'x.' When the returns have been received, compared, and the result ascertained by the board of county commissioners, if more than one-half of all the legal votes cast by those voting on the proposition are in favor of any particular place, the board must give notice of the result by publishing a notice thereof, in each newspaper in the county, at least once a week for four consecutive weeks, and the place so selected as the county seat shall be designated in such notice as the county seat, from a date specified therein not more than sixty days after the election.

"Sec. 4. The board of county commissioners shall cause a statement of the result of said election to be deposited and transmitted as provided by section 1885 of the Revised Codes of North Dakota for the year A. D. 1899.

"Sec. 5. All acts and parts of acts inconsistent with this act are hereby repealed; provided, however, that this act shall not apply in counties having more than six thousand five hundred inhabitants according to last census.

"Sec. 6. Whereas, there is now no law covering the subject matter named in this act, therefore an emergency exists, and this act shall take effect and be in force from and after its passage and approval."

It will be observed that the legislature, by said act, recognizes those counties wherein courthouses have not been erected as a class by themselves, and prescribes for such class a method to be pursued in the removal and relocation of county seats different and less difficult from that applying to the other counties of the state. It is conceded by counsel for petitioners that such a classification of the counties for the purposes aforesaid is permissible, if the act is general in its operation when applied to such class; but it is contended by them that the act in question is vicious for the reason that it is not general, but special, in its operation, as it does not embrace all counties without courthouses, but is expressly limited to counties having not more than 6,500 inhabitants, and also to those counties which were organized prior to the date of the passage of the act. It is argued that there is no valid reason why a county without county buildings having more than 6,500 inhabitants should not have the same right of removal of the county seat as a county having a less number of people, nor why a county organized after

the passage of the act in question which has no county buildings should not be treated in the same class as a county without county buildings at the time the act took effect. We will take up the last proposition first.

Counsel's argument is based upon the premise that said act excludes from its operation counties organized after its passage and approval. [If their premise is sound, we think their argument would be unanswerable, as such a classification would be clearly arbitrary and unreasonable, and therefore render the law special in its operation and clearly in violation of subdivision 3, chapter 69, of the constitution, which is as follows: "The legislature shall not pass local or special laws in any of the following enumerated cases; that is to say: * * * (3) Locating or changing county seats." We are entirely clear that counsel for petitioners wholly misconstrue the language employed in the act. As we read section 1, the clear legislative intent was that the same should apply to all counties, whether organized at the date of the passage of the act or thereafter organized, in which no courthouse has been constructed or is owned by such county, and which does not contain a population of more than 6,500 inhabitants. The clause, "prior to the taking effect of this act," relates to and qualifies the following clause, "has been constructed or is owned by such county." This clause was used to designate the dividing line between the two classes of counties. The legislative intent was to subject all organized counties having not to exceed 6,500 inhabitants and not having a courthouse at the date of the passage of the act to the operation of the law, even though they might thereafter, and before the institution of proceedings for the removal of their county seat, have constructed or purchased a courthouse. Without such clause the act would apply only to those counties which, at the date of the institution of county seat removal proceedings, have no courthouse. After the taking effect of said act the inhabitants of a county governed thereby are bound to take notice of the law, and hence are bound to know that proceedings for the removal of their county seat may be instituted under said act, even though they had previously thereto erected or purchased a courthouse. It is, therefore, plain that counties organized after the passage and approval of the act are included within the class of counties intended to be dealt with in said chapter.

The other objection urged to the validity of the law, that counties having more than 6,500 inhabitants according to the last cen-

sus are excluded from the operation of the act, is more serious.
Is there any reasonable basis for such a classification, or is it
purely arbitrary? We are not without precedents in this state
upon the rules so well settled elsewhere construing and applying
the constitutional limitations against legislative action of the char-
acter now under consideration. The law is well settled that a
classification of objects or places for the purpose of legislation
must be natural, not artificial. It must, in view of the character
of the legislation, have some reasonable basis. As aptly stated by
Chief Justice Beasley of the New Jersey court: "But the true
principle requires something more than a mere designation by such
characteristics as will serve to classify; for the characteristics which
thus serve as a basis for classification must be of such a nature as
to mark the object so designated as peculiarly requiring exclusive
legislation. There must be a substantial distinction, having refer-
ence to the subject-matter of the proposed legislation, between the
objects or places embraced in such legislation and  the  objects
or places  excluded.   The  marks  of  distinction  on  which
the classification is founded must be such, in the nature of things,
as will in some reasonable degree, at least, account for or justify
the restriction of the legislation." State v. Hammer, 42 N. J.
Law, 439.  Among the decisions of this court to the same effect
are Edmonds v. Herbrandson, 2 N. D. 270, 50 N. W. 970, 14 L.
R. A: 725; Vermont Loan & Trust Co. v. Whithed, 2 N. D. 82,
49 N. W. 318; Angell v. Cass County, 11 N. D. 265, 91 N. W. 72;
Beleal v. Railway Co., 15 N. D. 318, 108 N. W. 33; Plummer v.
Borsheim, 8 N. D. 565, 80 N. W. 690. In the light of the rule
thus firmly established, we can discover no justification for the
attempted classification, or any classification, on the basis of popu-
lation.   Why should a different rule regarding the removal of
county seats apply to counties having 6,600 inhabitants than ap-
plies to counties having but 6,500. We are unable to discover
any plausible or rational reason, and we believe none exists.

A similar question was also before the New Jersey court in
Anderson v. City of Trenton, 42 N. J. Law, 486. An act of that
state declared it lawful for any city within the state, having a
population of not less than 25,000 inhabitants, to borrow money
to the amount of its floating or unbonded indebtedness and to is-
sue bonds therefor. Such an act was held special legislation;
the court, among other things, saying: "The question to be de-

termined concerning the law now under review, therefore is whether, since it does not relate to all cities, it affects a class of cities constituted upon this principle—whether the basis of classification is some peculiar feature to which the provisions of the law are naturally related. The basis of classification is a minimum of population. The powers to be conferred by the statute concern the issue of bonds for the purpose of funding floating indebtedness. Now, I am unable to see any natural connection between the number of people in a city and its right to fund its floating debt. It is true that there may be some propriety in denying this authority to very small municipalities and granting it to larger ones; but the same may be said of almost every power usually possessed by cities, and it ·is manifest that if the classification made by a statute is to be justified, or not, by considering whether it is proper to apply the peculiar provisions of the law to the particular individual or individuals designed to be affected, then laws will be upheld or overthrown, not as the court shall decide them to be general or special, but as they shall deem them wise or unwise. No rule here-- tofore laid down in this state sanctions such a test of constitution-. ality, nor do I think that such a criterion should be adopted." In· commenting upon a Pennsylvania decision upholding a statute· which divided the cities of the state into three classes according to, population, the court further says: \"But that statute is distin- guishable from the one now before us, inasmuch as that classification was made for all the purposes of municipal legislation, and could therefore be regarded as a general classification, while in the present law the grouping of cities is for a special purpose only— to confer on some a power of funding debts not granted to others; and hence, in this aspect, the law is special. If it be sustained, the classes into which towns may be divided, on this simple basis of population, will be as numerous and diversified as the purposes of the legislature, and all the evils sought to be averted by the abol- ition of the power to legislate for individuals will return under the form of class legislation. I see no view in which this law will ap- pear to be general." The foregoing very clear and accurate state- ment of the law meets with our unqualified approval. Many au- thorities might be cited to · the same effect, but we content our- selves by referring to the following, in addition to those above cited: Morrison v. Bachert, 112 Pa. St. 322, 5 Atl. 739; Sutton v. State, 96 Tenn. 696, 36 S. W. 697, 33 L. R. A. 589, and cases cited.

We think the act in question is inhibited by the constitutional provisions aforesaid for the further reason that the counties within the class created by the act in question can never in the future pass from that class to the other class governed by the general law regarding removal of county seats. In other words, counties having no courthouses at the date of the passage of the act will be permitted to change the location of their county seat by a mere majority vote, even after they have constructed valuable courthouses, The necessary result would be that counties in all respects similarly situated, so far as courthouses and population are concerned, will be governed by different rules regarding the method of changing county seats. This is clearly contrary to the letter as well as the spirit of the constitutional provision against special legislation, and is directly opposed to the rule announced in Edmonds v. Herbrandson, supra, wherein Chief Justice Corliss, in speaking for the court, gave expression as follows: "We are inclined to the view that under the authorities, had the legislature not closed the door against accessories to the class of counties having a courthouse and jail exceeding $35,000 in value, the classification would have been proper; but an arbitrary time is fixed, after which no county coming within the same conditions which characterize the class can gain admittance to such class. 'Provided, that nothing in this act shall permit the removal to or relocation of the county seat of any county  *  *  *  wherein the courthouse and jail now erected exceed in value the sum of $35,-000.' This classification is not based upon natural reason, but upon the arbitrary fiat of the legislature. While it may be true that the county seat ought not to be so easily relocated in a county wherein the loss to the taxpayer will be greater by reason of the erection at the existing county seat of expensive buildings as in the county where such loss will be comparatively trifling in amount, it is not reasonable that the mere time when such expensive buildings are constructed should at all enter into the consideration of the matter. This law was approved March 7, 1890 (Laws 1890, page 168, chapter 56). So far as the value of improvements is concerned, it excepts only those counties wherein the courthouse and jail now erected exceed in value the sum of $35,000. If the word 'now' refers to the date of approval of the act, all counties having a courthouse and jail exceeding $35,000 in value on the 8th of March of that year, but not on the 7th; or if the word 'now' refers

to the date when the act took effect, i. e., July 1st, all counties in which the courthouse and jail worth more than $35,000 should be, completely erected on July 2d, instead of July 1st—would nevertheless be subject to the provisions of the new law, although the natural reason can suggest no justification for such a distinction. If the danger of serious loss to the taxpayer by the removal of a county seat from a place at which expensive buildings have been constructed affords reason for placing counties in which such a condition exists in a separate class, to be governed by more stringent legislation in this respect, there is no reason why a county in which for the first time such a condition exists on a later day should be excluded from this separate class any more than a county in which this condition existed the day before. There is no natural reason for a classification of counties in which the same conditions exist, based solely on and arbitrarily upon the period of time before or after which such conditions existed for the first time. Such a doctrine would lead inevitably to unlimited special legislation under the mere guise of classification. It would nullify the constitution so far as it prohibited special legislation." The opinion cites and quotes from many authorities sustaining the rule therein announced.

A similar question was before the supreme court of Minnesota in the case of Nichols v. Walter, 37 Minn. 264, 33 N. W. 800, and it was there said: "Recurring to the law in question, we find it divides the counties in two classes—the classification based upon an event in the past, so that no county in one class can ever pass into the other class; and to those in one class is applied what we may call the majority rule, and to those in the other the three-fifths rule. Had the act specified by name those counties in which one rule should apply, and those in which the other should apply, it would hardly be questioned that the legislation was special, and not general and uniform in its operation throughout the state. But the counties were, at the date of the act, identified, and their status fixed for all time, by reference to the specified event, as fully as though the counties were named. There is nothing in the event which is the basis of classification which suggests any necessity or propriety for a different rule to be applied to the counties to be placed in the two classes. Why one county, which had located its county seat by a vote of its electors, 25 years or 6 months before the act passed, should require a vote of three-fifths of its electors

to remove it, and the county which should so locate it 3 or 6 months: after the act passed may again remove or locate it on a mere majority vote, is impossible to conceive, except that the legislature. has arbitrarily so provided. But in such matters the legislature cannot arbitrarily so provide. The act is unconstitutional and void."

While we are not unmindful of the rule that courts are reluctant to declare legislative enactments unconstitutional, and will only do so in a clear case requiring it, we are forced to the conclusion, for the reasons above stated, that chapter 77, page 159, of the Laws of 1905, is unconstitutional and void as special or class. legislation.

It follows that the writ should issue. All concur.