STATE OF IOWA V. ALONZO DELONG, Appellant.

**Attempt to Rape.** An assault with an intent to commit rape is complete where defendant pursues and seizes a woman with the intention of having sexual intercourse with her, notwithstanding her resistance and against her will, although she subsequently consents.

Deemer, J., dissenting.

*Appeal from Madison District Court.*—HON. A. W. WILKINSON, Judge.

SATURDAY, DECEMBER 14, 1895.

The defendant was convicted of the crime of assault with intent to commit rape, and from the judgment which required him to be imprisoned in the penitentiary for a term of two years, he appeals.— *Affirmed.*

*Temple & Hardinger* for appellant.

*Milton Remley,* attorney general, for the state.

Robinson, J.—I.   The indictment charges that in May, 1892, the defendant made a felonious assault upon one Emma S. Gracey, with the intent to ravish and carnally know her against her will.   The testimony shows that the defendant visited the home of Emma S. Gracey on the tenth day of June, 1892.   At that time she had been married about six weeks, and was living on a farm with her husband.   The house they occupied stood fifteen or twenty feet west of, and facing, a public road, which extended from north to south.   A door in the front of the house opened into the sitting room, in the south part of which was a bed. In the northwest corner of the room was a door which opened into the kitchen.   In the southwest corner of that was an outside door, which opened to the west. In the northwest corner of the kitchen was a door which opened into the stairway.   This was winding at the bottom, and was inclosed on one side by a plastered wall and on the other by ceiling.   It led to a space or room which, we understand, was over the kitchen, and from that room there was an opening or way to a room over the front lower room.   Mrs. Gracey was nineteen years of age and had been acquainted with the defendant about ten years.   They had attended the same public school, spelling schools, church and Sunday school; but she states that she had never "kept company" with him, and that he had never

gone anywhere with her. About 2 o'clock in the afternoon of the day specified, the defendant passed the house riding a horse northward. The prosecutrix and her husband were then in the sitting room and saw him. After a short time the defendant returned, tied his horse to the fence in front of the house, went westward to the field where the husband was then at work, and made inquiries about cattle which he claimed had strayed. He then went back to the house. What there occurred is a matter of dispute. Mrs. Gracey's account of the affair is substantially as follows: She was upstairs when she heard a knock at the front door, and in response descended. The main door was open, but the doorway was closed by a screen door, which was unfastened. The defendant stood at the front door outside, and after some words of greeting asked if she had seen any stray cattle. She answered that she had not; and he then came into the sitting room, without being invited to do so, and seated himself in a chair a few feet south of the front door, and near the bed. Mrs. Gracey seated herself about the same distance north of the door. The defendant then remarked that a couple he named had married to spite her. She replied that the marriage didn't spite her any, as she had no interest in the parties. The two then sat in silence for some time. The defendant did not by his manner indicate any wrong design, and Mrs. Gracey was not alarmed. The silence was broken by the defendant who suddenly declared that he would have sexual intercourse with her. She said he should not. He declared he would, and she at once started for the door leading to the kitchen, to go through the kitchen and out toward her husband. The defendant followed, overtook her when she was near the middle of the kitchen, seized her by one arm, cursed and threatened her, opened the stairway door, and forced her to ascend, and to pass to the front upper room.

When there he compelled her to take a bed comforter from the bedstead and throw it on the floor. He then threw her upon it and attempted to have sexual intercourse. She resisted him successfully, and he finally desisted and departed. She made no outcry and her clothing was not torn. The defendant was twenty-one years of age at the time, and testified in his own behalf. He states that when he knocked at the door Mrs. Gracey came to it, unhooked the screen door, and invited him to come in and be seated. He denies that he threatened her or seized her; denies that she ran from him; denies that he forced her to go up the stairway; and denies that he compelled her to place the comforter on the floor, or that he threw her down. He further states that he did nothing while there to which she objected, and that she was in a good humor when they parted. He does not deny that he attempted to have sexual intercourse with her, and evidently desired the jury to understand that he accomplished his purpose, and that she fully consented to it from the first. There are, undoubtedly, circumstances which tend strongly to corroborate his theory of the transaction. The statements of Mrs. Gracey are not in all respects reasonable, and in several important particulars they conflict with her testimony given on a former trial of the case. She made no attempt to alarm her neighbors, although one lived only forty or fifty rods away, and another was nearer. The defendant insists that, if she was alarmed at anything he said or did, she could easily have passed out of the front door to the road, where she would have been safe, and that the fact that she went into the kitchen instead is an indication that she did not desire to avoid him, but rather to encourage his advances, and that if she had resisted him, as she claims to have done, her person and clothing would have shown marks of a struggle. What a woman should do in the situation in which

Mrs. Gracey was placed cannot be determined by any fixed rules. Perhaps no two women would do the same thing. With many, the desire to avoid publicity would influence their attempts to resist assault or flee from danger. The dread of being found in a situation most loathsome to every modest and virtuous woman might induce some to rely on other means to protect their virtue than public outcry. Others, stupefied by shame or fear, might fail to make use of the means of escape which would be most apparent and promising to a person free from excitement. What Mrs. Gracey did in this case, when alarmed, was most natural. To have gone towards the front door would have been to approach nearer to the defendant, and to have made an outcry would have been to court publicity. Moreover she did not know that any third person was within hearing. Instead of doing these things, which, with all the facts before us we can see would have been best for her to do, she went away from the defendant to the kitchen, and toward the outside kitchen door and her husband. That she did this for the purpose of avoiding the defendant and preventing his embraces, and that he pursued her and seized her, with the intention of accomplishing his purpose notwithstanding her resistance and against her will, the jury may well have found from the evidence. Marks and bruises on her arms, which she testifies were made by the defendant when he seized her, and while he was forcing her up the stairway, and which might well have been so made, were plainly visible more than a week after the occurrence. The statements of Mrs. Gracey which may be regarded as not entirely reasonable, and as conflicting, relate almost wholly to what transpired after she was seized in the kitchen, and after the defendant had commenced to force her up the stairway. She testifies that she had been unwell, and had been confined to her bed a part of the time,

only a day or two before, and that she was physically weak. Notwithstanding this there is reason to believe that she might have offered greater resistance than that she testifies to, and it is possible, as claimed by the defendant, that she yielded to him voluntarily. It is not necessary, however, to determine the facts with respect to that controversy. If the occurrences prior to the time she ascended the stairway were as she claims, and as the jury was authorized to find, the crime of which the defendant is convicted was complete, even though everything done thereafter was with the consent and according to the desires of the prosecutrix. *State v. Atherton*, 50 Iowa, 191; *State v. Cross*, 12 Iowa, 68. We conclude that the verdict was sustained by the evidence.

II. Complaints are made of the giving of certain portions of the charge, of the refusal to give certain instructions asked, and of remarks made by an attorney for the state in his closing argument to the jury. We do not find that any of these complaints are well founded. The jury was carefully instructed, and the argument objected to was not improper. We find no ground for disturbing the judgment of the district court, and it is *affirmed*.

Deemer, J.—I do not think the defendant is guilty of any offense greater than an assault and battery; and on the authority of *State v. Pilkington*, 92 Iowa, 92 (60 N. W. Rep. 502), and *State v. Biggs*, 93 Iowa, 125 (61 N. W. Rep. 417), and the rule that before one can be convicted of this offense it must appear that defendant intended to gratify his passion notwithstanding any possible resistance prosecutrix should make, I respectfully dissent from the conclusions of the majority in this case.