(118 N. W. 225.)

STATE OF NORTH DAKOTA v. WILLIAM CLAYTON RHOADES.

Opinion filed November 18, 1908.

**Criminal Law — Indictment and Information — Waiver of Defects — Sufficiency of Information.**

1. When attacked for the first time by motion in arrest of judgment, an information for the crime of rape in the first degree, drawn under subdivision 3 of section 8890, Rev. Codes 1905, will not be held fatally defective in not charging, in direct and positive language, that the female ravished resisted, and her resistance was overcome by force or violence.

**Same.**

2. An allegation that defendant did, "by force and violence, then and there overcome the resistence then and there made by ————,"

will, when its sufficiency is challenged only after verdict, be held equivalent to an allegation that the female ravished resisted, and that her resistance was overcome by defendant by force and violence.

**Same — Rape — Sufficiency of Evidence.**

3. Evidence examined, and *held* insufficient to support the verdict finding appellant guilty of rape in the first degree.

Appeal from District Court, Cass County; *Pollock, J.*

William Clayton Rhoades was convicted of crime, and appeals.

Reversed.

*U. W. Tilly* and *Turner, Wright & Lewis,* for appellant.

*W. H. Barnet,* State's Attorney, *Seth W. Richardson,* Assistant State's Attorney, and *T. F. McCue,* Attorney General, for the state.

FISK, J. Appellant was convicted of the crime of rape in the first degree, and sentenced to imprisonment in the penitentiary for the period of ten years, from which judgment he appeals.

Error is assigned upon the ruling of the trial court in denying appellant's motion for a new trial, and also his motion in arrest of judgment. The grounds urged in the motion for a new trial were that the verdict is contrary to the evidence and against law, and the grounds urged in arrest of judgment are: "(1) The information does not state facts sufficient to constitute a public offense; (2) the information does not state facts constituting the offense of rape in the first degree; (3) If the information charges any public offense it is that of rape in the second degree." The charging part of the information is as follows: "That at said time and place the above-named defendant, William Clayton Rhoades, did unlawfully and feloniously, by means of force and violence, then and there overcome the resistance then and there made by ————, she, the said ————, being then and there a female, and not then and there the wife of this defendant, and then and there under the above circumstances, have sexual intercourse with the said ————; that at said time and place the above-named defendant, William Clayton Rhoades, did feloniously have sexual intercourse with one ————, a female person, not the wife of the defendant, by then and there preventing said ———— from resisting, by means of threats of immediate and great bodily harm, then and there accompanied by apparent power of execution." Appellant's counsel expressly concede that there

is no merit in the first ground of the motion in arrest of judgment; their contention being that the information does not charge rape in the first, but merely in the second, degree.

The first pertinent inquiry, therefore, is whether the information sufficiently charges rape in the first degree as against an attack after verdict by motion in arrest of judgment. Section 8890, Revised Codes 1905, so far as applicable, defines rape as follows: "Rape is the act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances: (3) When she resists, and her resistance is overcome by force or violence. (4) When she is prevented from resisting by threats of immediate and great bodily harm, accompanied by apparent power of execution." Under section 8893, Revised Codes 1905, rape, accomplished in the manner mentioned in the third subdivision aforesaid, and also in certain other cases not material here, is rape in the first degree, and, when accomplished in the manner stated in the fourth subdivision, is rape in the second degree. By reference to said statute it will be seen that the crime of rape may be committed in several distinct ways, and among the several ways are those mentioned in subdivisions 3 and 4, namely, when the female ravished resists and her resistance is overcome by force or violence; and, when she is prevented from resisting by means of threats of immediate and great bodily harm, accompanied by apparent power of execution. The particular acts constituting the alleged rape should be set forth in the information in a manner sufficient to apprise the accused in which one of these different ways it is claimed he committed the offense. State v. Vorey, 41 Minn. 134, 43 N. W. 324, and cases cited. Under the information in the case at bar an apparent effort was made by the pleader to charge the commission of the offense under both of the subdivisions 3 and 4, and this in one count. This was clearly improper, but no demurrer was interposed, nor did appellant ask that the state be required to elect upon which theory it would proceed. Hence he has waived his right to urge the objection. It follows that, if the information properly charges rape in the first degree, and the evidence of defendant's guilt thereof is sufficient, the verdict must stand, although the information also charges rape in the second degree. Does it sufficiently charge rape in the first degree? It is contended by appellant's counsel that there is no allegation that the female resisted. The language employed in the informa-

tion is that the defendant did "overcome the resistance then and there made by ———." Is this a sufficient allegation that she then and there made resistance? It is said that the allegation that defendant overcame "the resistance then and there made," etc., must be regarded only as the conclusion of the pleader as to the legal effect of the specific act thereafter pleaded to-wit, that she was prevented from resisting by threats, etc. We think such construction not permissible. Without intimating what our decision would be if the sufficiency of the information had been challenged before verdict, we are constrained to hold that, after verdict, and on motion in arrest of judgment, the allegations of the information as to resistance by the female ravished must be held sufficient. While it is true that the general rule of criminal pleading, which has been embodied in our code (section 9849) requires the essential facts to be averred with directness and certainty, it is also true, as recently held by this court in State v. Johnson, 17 N. D. 552, 118, N. W. 230, that when challenged for the first time by motion in arrest of judgment, "the same strict rules will not be enforced in testing the sufficiency of the information as are applied, or will be applied, when its sufficiency is challenged by demurrer." That case is directly in point as sustaining the sufficiency of the information in the case at bar, as against an attack by motion in arrest of judgment.

This brings us to a consideration of the sufficiency of the evidence. Before reviewing the evidence, it is proper that we should briefly notice the established rules of law to be observed in considering such question. Under section 10,080, Revised Codes 1905, a new trial may be granted in criminal cases (subdivision 6) "When the verdict is * * * clearly against the evidence." An appellate court will not ordinarily disturb the decision of the trial judge in denying a motion for new trial, based upon alleged insufficiency of the evidence to support the verdict, and it will not do so in a criminal case, "where the record discloses evidence from which guilt of the accused can be fairly deduced," but it will interfere where it clearly appears that the verdict has no substantial support, or is clearly without support, in the evidence. State v. Denny, 17, N. D. 519, 117 N. W. 869; Williams v. State, 61 Wis. 281, 21 N. W. 56; Lam Yee v. State, 132 Wis. 527, 112 N. W. 425; 12 Cyc. 906-908, and cases cited. The verdict, finding appellant guilty of rape in the first degree, must be supported, if at

all, by evidence fairly tending to show that the prosecutrix resisted, and that her resistance was overcome by force or violence. Section 8890, subd. 3, Revised Codes 1905. Unlike the statutes of most states defining the crime of rape, out statute divides the offense into degrees, and provides, in effect among other things, that to constitute rape in the first degree there must be resistance by the female, and such resistance must be overcome by force or violence. If prevented from resisting by threats, etc., it is rape merely in the second degree. The question to what extent must there be resistance on the part of the female ravished to constitute rape in the first degree therefore logically presents itself. This question has often arisen and been decided in other jurisdictions, as the following citations will show: 23 Am. & Eng. Enc. Law (2d Ed.) 860-862, and numerous cases therein collated; Mills v. U. S., 164 U. S. 644, 17 Sup. Ct. 210, 41 L. Ed. 584; People v. Dohring, 59 N. Y. 374, 17 Am. St. Rep. 349; People v. Connor, 126 N. Y. 278, 27 N. E. 252; Vaughn v. State, (Neb.) 110 N. W. 992; Devoy v. State, 122 Wis. 152, 99 N. W. 455; Brown v. State, 127 Wis. 193, 106 N. W. 536; State v. Cowing, 99 Minn. 123, 108 N. W. 851, 9 Am. & Eng. Ann. Cas. 566. See valuable note on page 572 of last publication. In the last case many authorities are reviewed, and the rule deduced therefrom is summed up by Jaggard, J., as follows: "From the authorities as a whole it fairly appears: (1) That resistance by a female is an issue in a trial for rape only as it is involved in the necessary proof of her want of consent; (2) that to show such unwillingness her resistance must be proportionate to the occasion, under the circumstances and at the time of the act complained of—that is to say, in ordinary cases there must be resistance to the utmost, or at least to the extent of her ability, and in peculiar cases a less degree may be sufficient—(3) and that in exceptional cases rape may be made out without proof of resistance."

The above statement of the rule, in so far as it is applicable to our statute defining rape, meets with our full approval; but, in view of our statute making resistance an essential element of rape in the first degree, it cannot properly be said, as was said by the Minnesota, and other courts, "that resistance by the female is an issue in a trial for rape only as it is involved in the necessary proof of her want of consent." Our statute, so far as rape in the first

degree is concerned, requires more than a want of consent on the part of the female. It requires actual resistance on her part, and we think the resistance contemplated must be the utmost resistance within her ability under the circumstances. With these rules in view can it be correctly said that the verdict is clearly against the evidence? We have carefully considered the same, and with due deference to the views of the trial court we are forced to answer the above question in the affirmative. The testimony of the prosecutrix, it is but natural to assume, was as unfavorable to the accused as the facts warranted, and it, to our minds, comes far short of showing that degree of resistance essential to constitute rape in the first degreee. We will narrate the entire substance of the state's testimony, but prior to doing so, we desire to emphasize the importance of keeping in mind the fact that we are dealing with the sufficiency of the evidence to support the verdict for the statutory crime of rape in the first degree, and hence testimony as to threats made by the accused and the effect thereof, if any, in preventing the prosecutrix from resisting, serve to show rape in the second, rather than in the first, degree.

. Prosecutrix testified as follows: "Twenty-one years old last fall; came to Fargo about the 8th day of May, 1907; went to work at Hub restaurant waiting on the table; roomed with Mrs. Dunn about three months before this trouble happened. Her house was a two-story house. Mrs. Dunn had the upstairs or second story. There were about three rooms on the second floor upstairs. There was a young married couple rooming upstairs besides Mrs. Dunn. They left, and Mr. Rhoades, this defendant, took their place. Defendant was rooming there about a week before this trouble happened. Prior to the time this trouble took place he took me to different places of amusement; to the Bijou and Ideal. He would take me to the Bijou, and when I went home to my room, he would go with me. This trouble happened on a Sunday; don't remember exactly the date, it was the 1st or 24th, 24th of November or the 1st of December, 1907. On that Sunday the first time that I saw Mr. Rhoades was at noon time, I waited on him. I met him that day about 2 o'clock at the Hub restaurant. He asked me if I was working that afternoon. I says no. He asked me if I would go out for a street car ride. I said yes, and we went. We got back about 4:30 in the afternoon. I next saw him about 8 o'clock that evening up in the place where I roomed. I seen him in the

hall. He asked me if I wanted to go to church, and I says I would. He asked me to go to the Salvation Army, and I went. After we left the Salvation Army, we went home to my room. He went to his room, and I went to my room. I took my clothes, my coat off, and then sat down and practiced awhile on my telegraph instrument. Then the defendant came in, and he brought a revolver and put it down; don't know whether the revolver was loaded. He had a handful of bullets. He put the revolver on the stand. He talked like he usually did, in a friendly way. I was working on my instrument. He asked me if he should help me any, and I said yes. Then he helped me for a little while on the telegraph instrument, sent messages to me, then he left the room. I saw him again in about 20 minutes or so. After he went out of my room I undressed myself and threw myself over the bed, and laid there thinking. The light was burning. Q. What, if anything, did you do with respect to the door? A. I reached around, there is a lot of clothes hanging on my door, and I reached around and turned the key, it was just a little ways off, the door was closed when I turned the key. I meant to lock the door. Q. Then what did you do? A. Then I was lying there thinking, and I finally went to dosing, pretty near went to sleep. Then finally some one stepped in my room. I didn't know who it was at the time he stepped in. He then turned the key and locked the door; immediately went and blowed out the lamp and came right on to me. I found out who it was when he spoke to me. He didn't say much, just jumped onto me. I says, 'What do you want from me? What do want to do?' And he would not answer me. I told him to leave the room, and let me alone. Q. What did he do? A. He took hold of me and was going to force. He was in a night gown at the time. I was also undressed, and in my night gown Then he jumped onto me, and I asked him what he wanted from me, and he would not answer me. Then I says, 'Oh, Mr. Rhoades,' and I says, 'Please let me alone.' He says, 'I won't do it.' I says, 'I will report you,' and he says he don't give a damn, he says, and then I cried. I says, 'Have you got any parents to respect?' and he says no. Then I cried for help, and was crying all the while. I says, 'Oh, God, help me,' and he answered, 'He won't help you; I will help you now.' Then I tried to get out of my bed, and worked for about three hours, and then he says, 'God damn, Jesus Christ; if you don't shut up, I will kill you,' and it frightened

me so I could not help myself. Then I says, 'What do you try to do to me, spoil my reputation?' He says, 'You ain't the first one; that makes forty-one girls I took advantage of that way,' and I cried, and he left the room, and he told me to shut up and don't say a word, if I would, I would feel sorry for it. Q. Before he left the room did he, or did he not, have sexual intercourse with you? A. Yes, he did. I had never had intercouse with any man before. After he left my room I did not go to sleep any more. I got up and lit my lamp again, and I sat there and was crying all the while. Next day I got up and went to work again. I told Mrs. Bertha Plunkett about it. She was a friend of mine. She was working at the Hub restaurant where I was. I told her right the next day. I told Mrs. Jones, the cashier, a couple of days later. I was crying around there in the restaurant, and she came and asked me what was the matter, and then I told her about it. After that I told my roommate. I got the letter, Exhibit A, after he was arrested." Exhibit A is as follows: "Adelia: Say, you have gone and made a nice mess of this thing now. Everybody in town will know about it, and what will they think of you then. You will only get your name down, and that's all there will be to it, for you have no charge against me at all, so all the good it will do is just to cause a talk around town. Now the best thing for you to do is to get ready and go home tonight., and then there will be nothing more to it, and I have intended right along to do as I said I would, only I thought you was a little sore at me, and that's why I have been letting you alone for the last few days. Now you better think this all over, and do as I say, or you will ruin your name here, and all for nothing. Please write a letter to me, and send it back with this man and tell me what you will do, and if you decide to do this, you want to be sure and go home tonight. I am going to Glyndon tomorrow to work for a few days. Then I will come down to Parkers Prairie and see you. As ever, Clayt."

On cross-examination: "Q. What kind of a house was this of Mrs. Dunn's? A. Upstairs and down stairs. Q. There was some families directly under yours, wasn't there, on the first floor? A. Yes. There was a stovepipe going up through my room, the room I slept in. I think there was a family rooming right under my room. I have heard children crying down stairs. Q. You knew on this 1st day of December that there was a family rooming directly under your room? A. I knew there was some one down—

stairs, yes.  Q.  There was a family rooming across from your room wasn't there, just across from the hall?  A.  No, sir; not that I know of.  Q.  Just the other side of the hall from where you roomed in the same house?  A.  I don't know if there was a family, but I know there was people living in there.  There was no door or anything between.  They came into their room from the door downstairs.  There was no door going from the hall into their room.  This is a double house.  There was just a wall between us and the width of the hall.  I had known the defendant about a week before this occurrence.  He was boarding at the Hub, and was working at the Western Union.  He was rooming the same place I was at the time I first got acquainted with him.  I don't remember how soon after the first time I met him that I went out with him. It was more than one day.  I went out to the theater with him once between the time I first met him and the time of this trouble.  I went out once with him to the Bijou, once to the Ideal, and once to the Grand.  That is three times, and Sunday night I went out for a car ride with him, and then to the Salvation Army the same night.  That all occurred within a week before this trouble, and I had only met him for the first time but just a week before the trouble occurred.  I got pretty well acquainted with Rhoades within that week.  Mr. Rhoades from the time I met him in the restaurant up to the time of the trouble was a perfect gentleman.  The way I got acquainted with him he helped me along with my instrument.  I didn't know anything about Mr. Rhoades up to the time I got acquainted with him in the Hub restaurant. He was a perfect stranger to me.  I was perfectly willing to stop on my way home and go to the Bijou or the Grand or the Ideal with him.  After the show was over he would take me home with him, then I would go to my room, and I learned that he was a telegraph operator.  I was trying to learn that trade. He offered to come into my room and help me along all he could. I never asked him to come in.  He offered to help me along, and he did; yes he did come into my room.  After the shows were over, he would come into my room and show me how to operate the instrument.  He would stay there probably a half hour or so; about eleven o'clock he would leave my room and go to his.  Q.  During that week you and he were very friendly, weren't you?  A. He was very friendly to me.  He treated me nice, and helped me along.  Q.  There was no one in your room with you and him?

A. No; but I had my door wide open.   Q. There was no one up there was there?   A.   Mrs. Dunn was home that week.   Q.   When Mrs. Dunn was away on her vacation, there was no one upstairs at all, was there?   A.   Not at that time.   Q.   And you would invite Mr. Rhoades to come in and show you?   A.   No, sir; I never did.   I told him a good many times I didn't want anything to do with him.   Q.   You did?   A.   Yes I did.   I told him he must not come into my room.   Q.   And he still kept coming right along?   A.   He would not ask me whether he could come or not, and when I told him that he could not come there, he simply did not ask anything.   He just opened the door and walked right in during the week that Mrs. Dunn was away.   He kept that up for pretty nearly a week.   I didn't tell anybody that this Mr. Rhoades was coming into my room without my permission.   After I told him he just kept coming.   Q.   Why didn't you?   A.   Because I didn't want to, I was afraid of him.   Q.   He had not made any threats to you at that time, had he?   A.   No; he had not.   He had always been very polite, clever and pleasant to me.   Q.   Was Mr. Rhoades in your room after this Sunday that you say he assaulted you?   A.   Yes; he opened my door.   I had my door locked, and took my key out, and I went and worked at the banquet one night, and when I came home about 12 o'clock, my door was open, and I thought, 'Where is my roommate,' and I had my key with me. I walked in, in the dark, and there he sat and was waiting for me, and then he caught me and took away my key, and locked the door and kept me in there.   That was the next night after the trouble.   Yes; he took the key away from me and locked the door.   Q.   Was the lamp lit?   A.   I lighted the lamp myself when I went in, and when I had lit it, I looked around and saw him. Yes; he caught me.   Q.   Where did he catch you?   A.   He took hold of me.   Q.   What did he do?   A.   I told him to let me alone. Q.   Is that all you told him?   To let you alone?   A.   I was fighting, and—   Q.   Did you holler real loud?   A.   Yes I did, 'Let me alone.'   Q.   Was that the night after the occurrence?   There was nobody at home then?   A.   I don't know whether there was anybody down stairs.   Mrs. Dunn had not got home then.   The next day I went to work, and worked all day, and was crying about it. I think Mrs. Dunn came home the next day.   Q.   Did you tell Mrs. Dunn what occurred?   A.   No, sir; I didn't.   I did not tell her that Mr. Rhoades had broken into my room, and had assaulted

me Sunday night and had intercourse with me. Q. And you did not tell her that the next night, Monday night, he broke into your room, and that when you got home, he caught you and took the key away from you and locked the door, and stayed there until a late hour? You didn't tell her anything of that? A. No. Q. Why didn't you. A. Because I told Mrs. Plunkett, a lady friend of mine, first, and she advised me I should not, as long as I worked in public places, and I was ashamed to, and because I did not want to spoil my reputation as long as I had one, and was ashamed to say anything. That was why I didn't. Q. Never caressed you at all? A. Once he did, yes; but not that evening, before that. That was when he helped me that week when Mrs. Dnnn was home. The night of the trouble, the 1st of December, he and I were working away and visiting until about half past 10. I don't remember whether it was a little later or not. Q. And then he said he had got to go to his room? A. He got up and went to his room. He did not say anything, and I didn't say anything. I did not say good night to him; he did not say good night to me. He did not say a word. He just got up and left. When he left I was sitting there looking at my work, and after a little while I got up and undressed. I had my lamp burning, and I laid myself over the bed, and then I reached around and turned the key. Q. You did not turn the key in the door, or shut the door, until you had got into bed, did you? A. Not until I got into bed. The door was not open when I got into bed. I shut it myself. After I got into bed I turned the key. I am sure of it. Q. How did Rhoades get in there then? A. I thought the door was shut. There is a lot of clothes hanging on the door, and it must have got into the door, some clothes, I don't know. I turned the key, and I thought all the time it was locked. Q. Why didn't you turn the key before you got into bed? A. Because I didn't think of anything. I didn't have any idea. I didn't think of anything. I didn't have no bad thoughts in my mind at all. I always used to lock my door that way after I got into bed. Q. Still you knew this man was rooming next to you, and that you didn't want to have anything to do with him, and that you didn't want him to come into your room, and that you had forbidden him to come to your room, and still you did not lock your door before you got into bed, is that true? A. Yes; I told him I didn't want to have anything to do with him. Yes; I was

afraid of him. Q. Still you didn't lock the door before you got into bed? A. I locked the door when I went to bed. I got into bed before I locked the door. Q. Why didn't you lock it before you got into bed? A. I didn't think anything about it. I didn't have any such idea that anything like that should happen to me. When I got into bed and turned the key, I left the light burning. I was lying there thinking like I usually do; did not realize that I was getting sleepy. I just simply dropped off to sleep all of a sudden, and left the light burning; had been in bed about 20 minutes when I heard Mr. Rhoades come back into room. Q. The first thing you knew, then, this night after he went out was that you was awakened out of a sleep, and you looked around and you saw a man there? A. Yes. My light was burning. When I woke up did not see anything much, I was scared. Q. What did this man first say? A. He did not say a word to me. He was in his nightgown. When I first saw him, he was up to my lamp, and blowed it out. His back was towards me. When I first noticed him, and the lamp went out, I jumped and got scared; didn't jump out of bed, I just jumped up. I didn't know my self what I was doing. Q. Didn't you ask who it was or anything of that kind? A. He jumped onto me right away. I didn't have no chance to. He got on the bed. Then took hold of me. He got right on top of me the first thing, and held me down. I says, 'What do you want,' and he did not answer. He did not say a word, but all he did he jumped onto me and held me. Q. As I understand you, he walked to the lamp. That woke you up, and he blew the lamp out, and then he turned right around and came onto the bed? A. He came right onto me. Q. Came right straight to the bed the first act he done, and jumped right onto you? A. The first act he done was right on the bed, right onto me. He jumped across me, and held me. I was lying lengthways of the bed. Q. Was his face up close to yours? A. I don't remember. I got so excited that I was frightened and I don't know how it happened. Q. You say that you hollered? A. Yes; I did. Q. Real loud? A. Yes; I did. I am sure of that; don't remember how many times I did holler. Q. Did you keep on hollering? A. I kept on hollering, and I kept on crying. Q. When you were hollering what did you say? A. I had been begging him to let me go. I says, 'Mr. Rhoades have you got any sisters or brothers or parents that you have any respect for?' I

hollered just as loud as I could. Yes; I certainly did. Q. About how far could they hear you when you were hollering? A. If there was anybody around, they could hear the noise in my room. Q. If there was anybody in the house they could have heard you? A. Yes. Q. Anywhere in the house, you are sure you hollered that loud? A. I did make enough noise so anybody could hear it; yes, I did, I hollered for help. I says, 'God help me,' I says, I prayed. I says, 'Let me alone,' if I had any help here I says, and I asked him if he had any parents that he had any respect for, to let me go, I says, 'God help me, oh, God help me,' and I tried my best to get out of bed, and he pulled me back into bed. All he said, 'For God's sake don't get on the floor,' and I worked just as hard as I could till I was all played out, and I didn't give up, and he says 'God damn, Jesus Christ; if you don't shut up, I will kill you,' and the revolver was laying right in my room. Q. You were not so excited when he said that but what you could remember just what he said? A. Yes; that is the time I got so frightened. Q. You could not tell what he said to you? A. No; he did not speak to me. He did not speak anything to me. Q. You was so excited; you remember, though, that he said God damm it, and swore to you, and all that sort of thing? A. Yes; that frightened me. Q. Did he say anything to you when he came in there about wanting to get into bed with you? A. No; he didn't. Q. You were laying on top of the bed? A. Yes, in my night dress. I didn't get under the bed clothes at all. Q. When he got onto you, as you say, what did he first do then? A. He tried to take advantage of me. Q. What did he first do, what was the first act he done? A. He tried to pull up my night dress, and I would not let him. Q. You would not let him? A. No; I fought for it. Q. You kept it down all the time? A. Yes; I did all I could and he held my hand, and I held my knees together, and he just went onto me, and I worked as hard until all the clothes from the bed was all torn down. Then I finally gave up. I could not help myself; I had to. I could not assist myself at all any more, and he frightened me like that. After I had the trouble with Mr. Rhoades, he left my room and went to his room. I was scuffling and struggling with him for about three hours. When he left the room, I got up, but not right away. I laid there for a while. I didn't dress when I got up. I tried to go to sleep because I had to go to

work the next day, but I could not sleep. I just got up and walked around my room, and threw myself back on the bed and I was crying. I went to work the next morning at 7 o'clock. Q. Was there anybody up around the house at 7 o'clock when you got up? A. Not that I know of. I didn't see anybody. I don't know who I first saw that morning when I got to the restaurant. I think I saw the cashier first, Mrs. Jones. Q. Did you talk with Mrs. Jones when you went in? A. I did not right away. I took off my wraps and put on my apron and went to work. Q. Did not tell Mrs. Jones that Rhoades had assaulted you that night? A. No sir. Q. Did you tell any of your co-workers or any of the waiters about it that morning? A. No, sir; I did not say a word to anybody. I was friendly with all the girls that were working there, still I did not tell any of them of the trouble. Q. Did you ever tell your roommate that Mr. Rhoades had assaulted you that Sunday night? A. No; I did not. I never told any one but Mrs. Plunkett is the first one. I told her Monday evening the 2d. of December. Q. You swore to the complaint at the time it was made out, didn't you? A. Yes; I signed the paper down at the Police Station, about 20 days after this thing happened."

Redirect examination. "Q. You testified that this defendant. some time prior to the night this trouble happened had caressed you, or put his hands on you. Tell the jury how that happened, what he did? A. He pulled me on his chair. I told him to let me go. He didn't let me go. In a few minutes he did. That is the only time he caressed me."

Recross-examination. "Q. You say he pulled you on his chair. Did he pull you on his lap? A. Yes; he pulled me on his knee. That was before he went out to put on his night gown, and before I laid down on the bed, before I undressed. Q. And you just simply said, 'Let me alone?' A. I told him to let me alone, let me go, and he did. Q. Then you got right up and left him? A. Yes; he went out of my room. He didn't stay there at all. He was just getting ready to go, and after I told him to let me go and let me alone; he got right up and went to his room, knowing that I would not have anything to do with him, and in a short while, about 20 minutes, he undressed, and came right back into my room. I told Mrs. Plunkett first about this trouble the day after it happened. I didn't tell anybody else, not for a long while after. She advised me not to say a word and I didn't."

The foregoing is substantially all the state's evidence, and we submit that it signally fails to prove that degree of resistance by the prosecutrix essential to constitute rape in the first degree. Wherein does it tend in the least to show that the prosecutrix resisted defendant to the utmost of her ability? As stated in Vaugh v. State, supra, "Neither she nor the defendant seem to have suffered any bruises, scratches, or evidences of conflict of any kind, and her * * * clothing * * * bore no evidence of disturbance, * * * and there was no evidence * * * of such nervous disturbance as would be expected in an outraged woman." There was no evidence of a bruised condition of the parts, although she swore she had never had sexual intercourse with any one before. Numerous other people were in the house, and no one heard her alleged appeals for help. She did not communicate the fact of her ravishment to any one immediately thereafter, and did not make complaint against defendant until about three weeks after the occurrence. She admits that defendant was in her room the next night, which, if her story is true, is a very unlikely and unusual coincidence. Not only this but the committing magistrate testified to admissions made by the prosecutrix in his court to the effect that defendant visited her room once or twice after the occurrence, and that he got into bed with her, she claiming, however, that his said visits were against her will and without her consent. It is inconceivable that this could have happened, or would have happened, if she had resisted to the extent of her ability, and it is passing strange that no one in the house heard any disturbaance in her room on any of these occasions. The letter, Exhibit A, written by defendant to the prosecutrix, in no way tends in our opinion to strengthen the state's case. It rather has the opposite tendency. In the recent case of Brown v. State, supra, the supreme court of Wisconsin used language which is strikingly applicable to the case at bar. We quote: "Not only must there be an entire absence of mental consent or assent, but there must be the most vehement exercise of every physical means or faculty within the woman's power to resist the penetration of her person, and this must be shown to persist until the offense is consummated. * * * Further, it is settled in this state that no mere general statements of the prosecutrix, involving her conclusions, that she did her utmost, and the like, will suffice to establish this essential fact, but

she must relate the very acts done, in order that the jury and the court may judge whether any were omitted.  *  *  *  It is hardly within the range of reason that a man should come out of so desperate an encounter as the determined normal woman would make necessary, without signs thereof upon his hands, face, or clothing.  *  *  *  This court does not hold with some that, as a matter of law, rape cannot be established by the uncorroborated testimony of the sufferer, but, in common with all courts, recognizes that, without such corroboration, her testimony must be most clear and convincing.    Among the corroborating circumstances almost universally present in cases of actual rape are the signs and marks of the struggle upon the clothing and persons of the participants, and the complaint by the sufferer at the earliest opportunity.    In the present case the former is absolutely wanting.  *  *  *  Not a bruise or scratch on either was proved, and none existed on the prosecutrix.  *  *  *  When one pauses to reflect upon the ter-. rific resistance which the determined woman should make, such a situation is well-nigh incredible.

Without referring to the other evidence in the record tending to disprove the charge on which defendant was convicted, suffice it to say that we are clearly convinced that there was no evidence of such resistance as is essential to the crime of rape in the first degree, and hence it was error to deny the motion for a new trial.

Reversed and new trial ordered.    All concur.