# STATE OF NORTH DAKOTA v. HENRY E. OWENS.

## (144 N. W. 439.)

**Crime — attempt to commit rape — assault — proof — prosecution — defense.**

   1. In the case of a prosecution for the crime of an attempt to commit rape, there need merely be proof of an assault, and of an intent to overcome resistance if made. If such intent has existed at any time during the assault, it is no defense that the assailant later became tired of his efforts or afraid of the probable consequences of his acts, and for this or any other reason desisted without accomplishing his purpose or putting forth his full strength.

**Evidence — sufficiency — conviction.**

   2. Evidence examined, and *held* to justify a conviction of the crime of an attempt to commit rape.

Opinion filed December 1, 1913.

Appeal from the District Court of Traill County, *Pollock,* J.

Defendant convicted of the crime of an attempt to commit rape, and appeals.

Affirmed.

Statement of facts by BRUCE, J.    The defendant was convicted of an attempt to commit rape, and relies for a reversal on the insufficiency of the evidence to sustain the verdict.    The complaining witness and the defendant lived on neighboring farms near Cummings, North Dakota.    The assaults occurred in the home of the complaining witness, and while her husband was away.    The complaining witness in effect testified:

I first saw him as he rapped at the door.    When I opened the door I saw the defendant.    He asked if I had a fire in the stove.    I said, "Yes."    He said, "It was terrible cold."    After that remark he came in and sat down by the stove in the kitchen.    When he sat down I started to sweep the floor.    During this time nothing was said between me and the defendant.    I stayed out in the summer kitchen a long time washing myself and the baby.    I went into the house from the summer kitchen into the kitchen with the baby, who was crying.    The baby held my hand and I led him.    The defendant take hold of me and wants to kiss me.    I told him to quit and leave me alone, and I went up and went away from him over to the chair.

Q. Did he try to hold you?

A. Not so hard.    I went over to the chair and hold the baby in my lap, and he takes his chair and move over to my chair.    It was over where he took hold of me and pull me into his lap and tried to kiss me.    Then I go away from him and sat down in another chair.    The baby was crying yet.    The defendant said, "Let him go out and play."    I said, "No, it is too cold for him."    And he wants to kiss me again and sort of pinched me on the hip.    And he says, "Come, let's go into the other room."    And I said, "No," and went from that chair over to the other chair.    I says, "Why don't you keep your wife home?"    I says, "What you let your wife go for, and don't run after somebody else's?"    And he says, "That is what I am trying to do."    And I says, "Why don't you get yourself a wife, and don't run after somebody else's wife?"    He said, "That is what I am trying to do.    I will marry you."    And I says, "I am married and you are married, you know it can't go."    And the baby went down and the defendant came over and wanted to sit in my lap; he hold the arm around my neck and I push him down.    I pushed him from my lap.    I went up and started to

wash dishes, and he came there and wants to get hold of me and I went behind the stove. And he says, "Don't run behind the stove, don't get scared of me." And he says, "I won't going to hurt you." And I stand there until he went over to the chair and sat down, and I got done with the dishes. And he came and wants to get hold of me again, and I run out in the summer kitchen, standing in the door there holding the papers in my hand. And he came there and got hold of me and pushed me up against the wall of the coal room, the north side. It was outside in the summer kitchen. It was the south wall of the coal shed. He took hold of me and pushed me against the wall. He held my arms down against here. He hold around the back; hold around the arms here, and I was working to get loose, but I couldn't. Well, I was sweat, and then he says, "You are warmed up some now," and I says, "That is your fault." He want to kiss me. Try to hold his hands,—both my hands with one of his. Then he put his hand under my dress. He was able to hold both of my hands with one of his. He got his hand under my dress, had hold of my person, had hold of my body. He had hold of my privates. He says, "What matter with you." He asked me what was the matter with me, if I was flagged. I said, "Yes." He says, "You ain't tightened up any." I says, "That don't make any difference." When he had his hand on my privites he want me to go with him upstairs. He said I wasn't tightened up any. He says, "Look at this." He was holding his privates in his hand. They were not out of his pants. He said, "What should I do with this?" I said, "Keep it." He says, "I can't keep it. I got to put it up in something." He was not holding me so tight when this was going on. He stood close to me. I got away from him at that time. He let me go. I struggled with him; I worked all I could so I couldn't work any more. I was clear sweat and tired, and could not hardly stand up. I didn't cry; I couldn't. No, I don't cry so easy. I got so nervous I didn't know what to do. When I got away from him he says I got to promise him one. I said, "No." I was sweating, working to get away from him. He says, "I got you warmed up some." I was scared of him at that time. I told him, "If you don't quit, I tell my husband about this." And he says, "You won't do that, I was stuck on you for the first time I seen you." And I says, "Well, nothing to get stuck on," and he says, "I did." And he

says, "I am going to go," and I says, "I wish you would," and he says, "Come, follow me out. I am going to go." And I went out, I think maybe I can get him start to go.

Q. What did you go out for?

A. I thought maybe I could get him to go home. I went out to the fence. I was standing there, and he says, "Oh, I bet you would be good." He was holding on my back. He was holding on my back (indicating buttocks). I tried to get away from him then. Well, I want to go into the house. I went away from the fence and want to, and he says, "Don't run, don't go." He was not holding me so tight; I couldn't get away from him. I stood there at the gate about five minutes.

Q. Why did you not get away from him?

A. I was sweat and thought it was good to be out. I didn't permit him to stand there and hold his hand over my person. He got his hand on my back and I got away from him. I got away from him right away. He did not hold his hand on my back all the time I was standing there. The minute he put his hand on my back I got away from him. My husband was not home then, he was threshing. I got so nervous. I went in the house and got ready and went down where he was. About a mile, down to my sister's. I took the children with me. I was in a state of excitement, I couldn't eat, sleep, work, or do anything for a long time. I was struggling to get away from him when I was standing in the summer kitchen backed up against the south wall of the coal house, about ten minutes. My clothes were not torn. I did not have my monthlies at that time. He held his hands on my privates for about four or five minutes. I crossed my legs for about five minutes. This was the 25th, I think. He came back the second time Saturday of the same week. He knocked. I heard him knock and I went out to the door. I was standing on the porch and heard him come walking into the house. I did not hear anything more of him and I was busy,—have to wash the floor and I think maybe he was gone. I went in the house and he was standing in the kitchen door. I saw him and two other men on a load of grain. He got off on the north side. I was scared of him at that time. I saw him come towards the house. Didn't see the door he was going to.

I saw him start north. Heard him rap. When I heard it I ran out on the south side. I was in the kitchen when I heard him rap, and ran from the kitchen and sitting room out in the door at the south side of the sitting room. I was standing out there about ten or fifteen minutes. Didn't hear him in the house. Didn't go into the house while I heard him walking. When it was quiet I went in. I did not know for sure that he was there. I thought maybe he was gone. When I returned into the house he was standing right in the door there that goes into the summer kitchen. He asked me where I had been. I said, "I was outside." He came in and sat down on a chair, and I started to wash the floor. He said, "Come, let's go into the other room." I said, "No." He says, "Don't you make up your mind yet?" I said, "No, I never make up my mind." "Well, you promised me once," he said. I said, "No. I did not." And I wash,—got the table away there and I washes. He was not in the room when I started to wash. He was sitting there. He was sitting in the kitchen. I said, "If you don't quit running after me, I put you fast,—I put you in jail." And he says, "You ain't mean enough to do that." I said, "Yes." And he says, "I was stuck on you from the first time I seen you." And I says, "You musn't do that. And you wait until my husband coming after you," I says. "What will he do," he says. "Will he shoot me?" I said, "I don't know." And he says, "I want to kiss you." I said, "No, I never kiss you." I wants to run outside and he said, "Don't run outside, the men seen you." "I don't care," I said, "I tell the men to come in." He says, "You musn't do that." I was running all the way I could from him. He wants to catch me, and he grabbed me there on the floor and hold tight across my neck. I pushed my head good and got away from him; I take his coat and tear one or two buttons off his coat. He had hold of me hard there, He said he wanted to kiss me. He said nothing else. He went out of the door and went away. I got loose away from him. I tell him, "If you don't quit I holler for the men." They were in the granary then. I told him I will holler for the men, and he went. When Mr. Owens left the place the second time I went in the house and sat down. I was so nervous; I didn't do anything. My husband came home about five.

On cross-examination the witness practically testified to the same facts, saying among other things:

He held me tight and I could not get away from him. He had his arms around me. I told him to leave me alone. I was working till I sweat. I was working to get loose. I got sweat. I got warm when I was up there, and he said, "I got you warmed up some." I said, "That's your fault." He tried to hold both my arms with one of his and his body. He got my arms like this and then he got his whole body holding me up to the wall. He did not have both arms around me then. He was holding me with one of his arms. He put his hand under my dress. I crossed my legs, worked one of my arms loose and got his hand away. I pushed his hand away. Then he said, "What is the matter with you." He asked me if I was flagged, and I said, "Yes." He says, "You ain't tightened up any." I says, "That don't make any difference, I told my husband about you." And he says, "You wouldn't do that." He was holding his own thing in his hand like this. I testified to this in justice court; am sure of that. I said he was holding his thing in his hand. I swore to that in justice court. He was standing there holding me yet. I got his hand away. I kept my legs crossed all the time he was there when he got his hand under my dress. He got his hand under my dress; was that way about five minutes. I was not doing anything. He was standing there talking. He say, "Look at this."

Q. How did you get away from this position?

A. Went away from there. He let me go. When he let me go, I said, "I am going to tell my husband about it." That was before he let me go. Then he let me go. I was so nervous and I could hardly stand up. I don't know why he let me go. I went over to the door for I was so warm. He let me go over. I walked away from there. I went from the wall over to the door. He let me go and I walked over around to the open door. I was standing there. He wants we to go with him upstairs, and I said "No, I won't." I stood there talking with him about five minutes or so. He said, "I am going to go. Follow me out." I went over to the fence and he said he was going away and wants me to go with him out. I told him to go. He didn't go, he wants me to follow him up. I went out with him. I followed him to the fence. It is about across the street from the sum-

mer kitchen door. I walked with him out to the fence. I did not stand there very long. He did not have his hand on me when we walked out there. Had his hand on me after we got there. He was holding on my back. Right here (indicating buttocks). Did not stand that way very long. Stood at the fence about five minutes. He wants me to go over to the barn with him. He went to the barn. I went in the house.

*F. W. Ames* and *P. S. Swenson,* for appellant.

The conviction in this case must be sustained, if at all, upon the uncorroborated testimony of the prosecutrix. If this is sufficient, and the jury believed it, this court would sustain the verdict. State v. Rhoades, 17 N. D. 579, 118 N. W. 233; People v. Mayes, 66 Cal. 597, 6 Pac. 691.

The jury must be satisfied beyond a reasonable doubt that defendant *intended* to accomplish his purpose, notwithstanding resistance of prosecutrix. Rex v. Lloyd, 7 Car. & P. 318; State v. Hagerman, 47 Iowa, 152.

The assault must be with the specific intention to commit the act by force, and without the consent of the woman. People v. Fleming, 94 Cal. 308, 29 Pac. 647; Bawcom v. State, 49 Tex. Crim. Rep. 417, 94 S. W. 462.

Beseeching the woman to do the act, coaxing, and even assault are insufficient, unless accompanied by an *intent* on defendant's part to accomplish his purpose without her consent. Franey v. People, 210 Ill. 206, 71 N. E. 443; State v. Scholl, 130 Mo. 396, 32 S. W. 968.

The crime can only be committed by the attempt to use necessary force to accomplish the purpose, and with the present intent to do so. Warren v. State, 51 Tex. Crim. Rep. 598, 103 S. W. 888; Douglass v. State, 105 Ark. 218, 42 L.R.A.(N.S.) 524, 150 S. W. 860; Franey v. People, supra; Skinner v. State, 28 Neb. 814, 45 N. W. 53; Dina v. State, 46 Tex. Crim. Rep. 402, 78 S. W. 230; People v. Kirwin, 10 N. Y. Crim. Rep. 338, 22 N. Y. Supp. 164; Moore v. State, 79 Wis. 546, 48 N. W. 653; 23 Am. & Eng. Enc. Law, 2d ed. 864, 33 Cyc. 1494, note 74, etc.

The law with reference to "attempts" and "assault with intent" is the

same.  12 Cyc. 179; 33 Cyc. 1429–1493; Rookey v. State, 70 Conn. 104, 38 Atl. 911.

*Chas. A. Lyche,* for respondent.

*Intent* is the gravamen of this offense, and no particular degree of force is necessary.  Evidence of force is offered to prove the offense. Rev. Codes 1905, § 9501; People v. Kuches, 120 Cal. 566, 52 Pac. 1002; People v. Bowman, 6 Cal. App. 749, 93 Pac. 198; People v. Collins, 5 Cal. App. 654, 91 Pac. 158; State v. Barkley, 129 Iowa, 484, 105 N. W. 506; State v. Miller, 124 Iowa, 429, 100 N. W. 334; State v. Urie, 101 Iowa, 411, 70 N. W. 603; State v. Rudd, 97 Iowa, 389, 66 N. W. 748; State v. Delong, 96 Iowa, 471, 65 N. W. 402; State v. Grossheim, 79 Iowa, 75, 44 N. W. 541; People v. Toutant, 133 Mich. 520, 95 N. W. 541; Strong v. State, 63 Neb. 440, 88 N. W. 772; Bannen v. State, 115 Wis. 317, 91 N. W. 107, 965; Tuttle v. State, 83 Ark. 379, 104 S. W. 135; Territory v. Keyes, 5 Dak. 244, 38 N. W. 440; Boyd v. State, 74 Ga. 356; Hanes v. State, 155 Ind. 112, 57 N. E. 704; State v. Jerome, 82 Iowa, 749, 48 N. W. 722; State v. Prather, 136 Mo. 20, 37 S. W. 805; Head v. State, 43 Neb. 30, 61 N. W. 494; Wilson v. State, — Tex. Crim. Rep. —, 73 S. W. 16; Glover v. Com. 86 Va. 382, 10 S. E. 420.

The appellate court will not reverse the findings of the jury as to the existence of an *intent* to rape, unless there is *no evidence* thereof in the case.  If there is substantial evidence, or evidence upon which the jury could reasonably act, their verdict will not be disturbed.  Brown v. State, 121 Ala. 9, 25 So. 744; Smith v. State, 129 Ala. 89, 87 Am. St. Rep. 47, 29 So. 699; Pleasant v. State, 13 Ark. 360; People v. Cesena, 90 Cal. 381, 27 Pac. 300; People v. Stewart, 97 Cal. 238, 32 Pac. 8; People v. Johnson, 131 Cal. 511, 63 Pac. 842; Dunn v. State, 56 Ga. 401; State v. Whitsett, 111 Mo. 202, 19 S. W. 1097; State v. Prather, 136 Mo. 20, 37 S. W. 805; State v. Edie, 147 Mo. 535, 49 S. W. 563; State v. Alcorn, 137 Mo. 121, 38 S. W. 548; Reynolds v. People, 41 How. Pr. 179; Fitzpatrick v. People, 98 Ill. 269; Lathrop v. People, 197 Ill. 169, 64 N. E. 385; State v. Kendall, 56 Kan. 238, 42 Pac. 711; State v. Sullivan, 68 Vt. 540, 35 Atl. 479; State v. Hanlon, 62 Vt. 334, 19 Atl. 773; State v. McCune, 16 Utah, 170, 51 Pac. 818; State v. Courtemarch, 11 Wash. 446, 39 Pac. 955; Dockery v. State, 35 Tex. Crim. Rep. 487, 34 S. W. 281; Farmer

v. State, — Tex. Crim. Rep. —, 45 S. W. 701; State v. Page, 127 N. C. 512, 37 S. E. 66; State v. Williams, 121 N. C. 628, 28 S. E. 405; State v. Deberry, 123 N. C. 703, 31 S. E. 272; DeBerry v. State, 99 Tenn. 207, 42 S. W. 31; McAvoy v. State, 41 Tex. Crim. Rep. 56, 51 S. W. 928; Norris v. State, 87 Ala. 85, 6 So. 371.

No corroboration in this case is necessary, for there is no law re· quiring it. 33 Cyc. 1512, and cases cited; State v. Rhoades, 17 N. D. 580, 118 N. W. 233.

A new trial will not be granted for newly discovered evidence which is merely impeaching. 29 Cyc. 918.

Bruce, J. (after stating the facts as above). Defendant seeks for a reversal on the ground that the testimony was insufficient to sustain the verdict. It is argued that the verdict rests upon the uncorroborated evidence of the prosecutrix; that she is flatly contradicted by the defendant, and that the testimony fails to show that the assault was made with intent to commit rape notwithstanding all possible resistance that should be made; and fails to show that the intent was to perpetrate the crime at all events regardless of what the prosecutrix might or could do to prevent it. It is stated that the testimony shows that the defendant was a man weighing 230 pounds at the time of the alleged offense, and that he had been a man used to and capable of lifting great weights; was a strong and powerful person; and that the prosecutrix was a married woman and the mother of children, and weighed only 130 pounds. It is claimed that the place where the acts occurred was at least one-half a mile from any residence, and the testimony shows that no one was at hand to interpose. The testimony, in short, it is claimed, at its most and if uncontradicted, would show nothing more than persistent, continued, and vehement solicitation for voluntary sexual intercourse with the defendant.

We do not so understand the law or the evidence. It is true that the defendant weighed 230 pounds. It is also true, however, that there is evidence to the effect that he was fat, was only 5 feet 6 inches tall, and was far from being normal as to physique. There is a wide distinction between the crime of rape and the crime of an attempt to commit rape. In the crime of rape there must be proof of both the intent and the fact of overcoming all reasonable resistance. In the

26 N. D.—22.

case of the crime of an attempt to commit rape there need merely be proof of the assault and of the intent to overcome resistance if made, and that the prosecutrix finally desisted from her struggles and yielded does not necessarily negative the fact that during the struggles, and until the acquiescence, the defendant intended to use the force necessary to overcome it. Nor, if he started with, or at any time during the struggle had, the intention to overcome such resistance with force, is it a defense that he became tired of his efforts, and for this or any other reason desisted without accomplishing his purpose or putting forth his full strength. Whether he had such an intention at any time during the struggle was for the jury to determine from the facts. It seems to us that the jury was perfectly justified in concluding from the evidence before them that at some time during the assaults the defendant intended to overcome all reasonable resistance. It is true that the evidence in this case is uncorroborated, but it appears to us to be credible and consistent throughout, and there appear to have been no errors committed by the court during the trial of the case. In such a case corroboration is not necessary. See 33 Cyc. 1512, and cases cited. State v. Rhoades, 17 N. D. 579, 594, 118 N. W. 233. It has been held, and properly, that "the use of force in an endeavor to have carnal knowledge of a woman tends to show an intent to commit rape, and such intent may exist consistently with the fact of a subsequent consent. A person, then, may be indicted for rape, and if the conviction for that offense is prevented by reason of evidence of the woman's consent, yet if, before the consent was given, it appears that the defendant used such force as to evince an intention to commit rape, the defendant may be convicted of an assault with an intent to commit rape." State v. Atherton, 50 Iowa, 189, 32 Am. Rep. 134; 33 Cyc. 1495; State v. Cross, 12 Iowa, 66, 79 Am. Dec. 519; State v. Bagan, 41 Minn. 285, 43 N. W. 5. The same must, of course, be true in cases where a man makes an assault with intent to commit rape, but desists before the consummation of his purpose on account of the struggles of the woman, the discovery of the fact that she is in the midst of her period of menstruation, or on account of a sudden fear of the consequences. In the case of State v. De Long, 96 Iowa, 471, 65 N. W. 402, we have facts very similar to those in the case at bar. In it the court said: "The statements of Mrs. Gracey are not

in all respects reasonable, and in several important particulars they conflict with her testimony given on a former trial of the case. She made no attempt to alarm her neighbors, although one lived only 40 or 50 rods away, and another was nearer. The defendant insists that if she was alarmed at anything he said or did, she could easily have passed out of the front door to the road, where she would have been safe, and that the fact that she went into the kitchen instead is an indication that she did not desire to avoid him, but rather to encourage his advances, and that if she had resisted him, as she claims to have done, her person and clothing would have shown marks of a struggle. What a woman should do in the situation in which Mrs. Gracey was placed cannot be determined by any fixed rules. Perhaps no two women would do the same thing. With many, the desire to avoid publicity would influence their attempt to resist assault or flee from danger. The dread of being found in a situation most loathsome to every modest and virtuous woman might induce some to rely on other means to protect their virtue than public outcry. Others, stupified by shame or fear, might fail to make use of the means of escape which would be most apparent and promising to a person free from excitement. What Mrs. Gracey did in this case, when alarmed, was most natural. To have gone towards the front door would have been to approach nearer to the defendant, and to have made an outcry would have been to court publicity. Moreover, she did not know that any third person was within hearing. Instead of doing these things, which, with all the facts before us, we can see would have been best for her to do, she went away from the defendant to the kitchen and toward the outside kitchen door and her husband. That she did this for the purpose of avoiding the defendant and preventing his embraces, and that he pursued her and seized her, with the intention of accomplishing his purpose notwithstanding her resistance and against her will, the jury may well have found from the evidence. . . . If the occurrences prior to the time she ascended the stairway were as she claims, and as the jury was authorized to find, the crime of which the defendant was convicted was complete, even though everything done thereafter was with the consent and according to the desires of the prosecutrix."

"It cannot be seriously controverted," says the supreme court of

Alabama in Brown v. State, 121 Ala. 9, 25 So. 744, "that the evidence to sustain a conviction for an assault upon a girl with an intent forcibly to ravish her must establish the intent of the defendant to ravish beyond a reasonable doubt. That such an intent existed in the mind of the defendant at the time of an assault with force must oftentimes be gathered solely from his conduct, acts of violence perpetrated upon the female, the age of the female, previous relations existing between them if any existed, time and place of the assault, and other circumstances attendant upon the occurrence. It is seldom that a case can be found where the court can, as a matter of law, determine from the evidence that the intent to ravish did or did not exist. Where the intent rests in inference to be deduced from the facts proven, its existence or nonexistence must be submitted to the jury for their determination." See also Lathrop v. People, 197 Ill. 169, 64 N. E. 385. In the case of State v. Page, 127 N. C. 512, 37 S. E. 66, the prosecutrix testified that the defendant opened the door of her room, where she was lying down on a pallet with her baby, and asked where her husband was. Being told that he was absent, the defendant expressed his intention to put his hands on her. She said, "No, you are not," whereupon he started into the room, when she jumped up and ran to the back door, which was in an adjoining room, leaving her baby upon the floor. The defendant pursued her, and, as she caught hold of the knob of the back door, he caught hold of her and also put his other arm between her and the door. After a struggle, she got loose, and, opening the door, she escaped into the back yard. He did not follow her further, it seems, and, being told by her that she would tell her husband, asked her not to do so, and said he had only felt of her breast. The court, in its opinion, said: "Upon the above testimony, we cannot declare, as a matter of law, that there was no evidence of an assault 'with felonious intent to have carnal knowledge of the person of the prosecutrix, forcibly and against her will.' . . . The intent of the defendant is solely for the jury. The judge and jury see the bearing of the witnesses under examination and many other things incident to a trial which throw a vivid light in the investigation of the truth, but which cannot be transmitted in the cold words of a transcript sent to this court. One great advantage of a trial by jury is that they can see and hear and judge from their knowledge

of human nature and of everyday things of life in coming to a correct conclusion upon matters which are too intangible to be passed up to an appellate court in the transcript. But, at all events, the prosecutrix testified that the defendant invaded her house, threatening to lay hands upon her, pursued her to the back door, took hold of her, and attempted to prevent her escape, and that she got loose from him only after a struggle, and the defendant confessed the truth of her statement, and added that he stopped because he feared her husband would return. In submitting the evidence of his intent to the jury, there was no error."

Counsel, it is true, states that in the case at bar the female was an adult, and that in most of the cases cited by the state, the prosecutrix was under the age of consent, and that in such cases an assault with intention to have intercourse would necessarily mean attempt to commit rape, whether there was an intention to overcome resistance or not. We need not here, however, decide the question whether there can be an assault with an intent to commit rape on a nonconsenting female, when she is under the age of consent, but refer merely to the cases and discussion in 33 Cyc. 1434. All we have to say is that in the following long list of cases, the woman was either an adult and above the age when failure to consent would be implied, or no age of consent had been prescribed by statute: Brown v. State, 121 Ala. 9, 25 So. 744; Smith v. State, 129 Ala. 89, 87 Am. St. Rep. 47, 29 So. 699; State v. Whitsett, 111 Mo. 202, 19 S. W. 1097; State v. Edie, 147 Mo. 535, 49 S. W. 563; Lathrop v. People, 197 Ill. 169, 64 N. E. 385; Fitzpatrick v. People, 98 Ill. 269; State v. McCune, 16 Utah, 170, 51 Pac. 818; State v. Hanlon, 62 Vt. 334, 19 Atl. 773; State v. Williams, 121 N. C. 628, 28 S. E. 405; Norris v. State, 87 Ala. 85, 6 So. 371; Farmer v. State, — Tex. Crim. Rep. —, 45 S. W. 701; People v. Kuches, 120 Cal. 566, 52 Pac. 1002; State v. Barkley, 129 Iowa, 484, 105 N. W. 506; State v. Miller, 124 Iowa, 429, 100 N. W. 334; State v. Urie, 101 Iowa, 411, 70 N. W. 603; State v. Rudd, 97 Iowa, 389, 66 N. W. 748; Bannen v. State, 115 Wis. 317, 91 N. W. 107, 965; People v. Bowman, 6 Cal. App. 749, 93 Pac. 198.

The judgment of the District Court is affirmed.